# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNNY AGUILAR,<br><br>        Petitioner,<br><br>   v.<br><br>W. L. MONTGOMERY, Warden,<br><br>        Respondent. | CASE NO. 1:14-CV-1345-AWI-SMS<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DENIAL OF THE PETITION |

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 1. The petition was transferred to this Court from the Central District of California. Doc. 4. This Court screened the petition and, without addressing the merits, concluded that it was not plain from the allegations that Petitioner is not entitled to relief and directed Respondent to file a response. Doc. 11. Respondent filed an answer addressing the merits of the petition. Doc. 20. Petitioner did not file a traverse. For the following reasons, the Court recommends that the petition be denied.

## I.      BACKGROUND

On July 2, 2009, Petitioner was visiting or residing at the Sahara Motel ("Motel") in Fresno with Mary Jane Bustamante.[1] Another Motel resident, Andrew Brand, testified that around 5 a.m., he saw smoke coming from Ms. Bustamante's room and ran downstairs to notify the Motel manager. He ran back upstairs and saw Petitioner walking away from Ms. Bustamante's room. Petitioner asked Mr. Brand if he had a cell phone to call 911. He did not, and he told Petitioner to

---

[1] This brief factual background is summarized from the California Court of Appeals opinion.

use the pay phone. Mr. Brand and the motel manager's husband each grabbed a fire extinguisher and kicked down the locked door when there was no response from within. The room was full of smoke and there was a body on the bed. There was no response when they "wiggled" the person's foot.

The Motel manager, Deborah Johnson, testified that she was woken by Mr. Brand on the morning of the fire. As the firefighters arrived, she realized Petitioner was standing next to her. She testified that she asked him if Ms. Bustamonte was in the room. He replied, "She was a few minutes ago" and further said "that's what karma gets you." The motel manager testified that he walked off of the property after making the statement and she did not see him again that day.

The Fresno Fire Department arrived and saw flames crawling up the wall above the bed, but they did not see a body on the bed. They activated hoses, which turned the smoke into steam and left no visibility. Flames were coming from underneath the bed, so they flipped the mattress and extinguish the fire. The fire was extinguished within a few minutes of the firefighters' arrival. They discovered Ms. Bustamante's body as the smoke cleared.

About an hour later, the Fire Department's Arson Investigation Unit arrived. The smoke damage indicated that it was a smoldering fire. There were several discarded cigarettes and cigarette butts, matches, and a lighter on the floor. The investigators' initial opinion was that the fire was consistent with the victim possibly falling asleep with a cigarette. Detective Gray also arrived and believed that the fire initially appeared to be an accident.

Later that morning, chief forensic pathologist Dr. Venu Gopal, conducted an autopsy on Ms. Bustamante's body. He found that there were thermal burns on 85 percent of the body. She suffered a subgaleal hemorrhage on the left side of her head, consistent with trauma from a blunt object requiring a moderate amount of force. She also suffered a subconjunctival hemorrhage inside the eyes, which could have resulted from strangulation or an obstruction around the neck. Ms. Bustamante also had a hemorrhage on the left horn of the hyoid bone, or the "wishbone," which usually occurs when localized force or pressure is applied. She also suffered hemorrhages around the Adams apple area, and inside the larynx and surrounding tissue. Dr. Gopal explained that these hemorrhages occurred prior to death. He also explained that there was a small amount of

soot and carbon particles in Ms. Bustamante's trachea, but no carbon monoxide in her body. Dr. Gopal ordered toxicology tests which were positive for high levels of cocaine and cocaine metabolites. Dr. Gopal testified that this was a "difficult case," but his opinion as to the cause of death was the combined effects of acute cocaine intoxication and strangulation. He further testified that she was likely incapacitated or in a coma as the fire started, and could have taken a few breaths before dying.

A fire investigator was present during the autopsy and was advised of the skull injuries, but not the strangulation. Dr. Gopal told him about internal neck injuries and possible strangulation later that day or the next day.

Within a day or two of the fire, three people had telephoned a detective about the motel fire: Petitioner's sister, Petitioner's mother, and a family friend. On July 6, 2009, four days after the fire, Detective Gray interviewed the three. Petitioner's sister, Rebekah Palacios, said she and Petitioner went for a walk on July 2, 2009 during the daytime, and he told her that he had strangled a woman, kicked her in the head, and set the room on fire to cover the murder. She had used marijuana and Petitioner had used methamphetamine and cocaine. Petitioner's sister testified at the preliminary hearing that she may have learned some of the details from her other brother, Elias Robert. At the trial, Petitioner's sister testified that Petitioner said that he was in the Motel room with a woman and another man, using drugs. He said she was a snitch and that he put in the bathtub, choked her with the shower curtain, and kicked her in the head. He said a man walked in and Petitioner asked him to leave. He said he made a hole in the bed and put toilet paper in it, lit the paper on fire, and left the room. On direct and cross-examination, Petitioner's sister offered inconsistent testimony as to whether Petitioner directly told her certain details or she heard this information from Petitioner and her other brother, Elias Robert, who did not appear to testify at trial. She also testified that she overheard her mother and Elias Robert speaking about the incident about one or two hours before she spoke with Petitioner, and that she told her mother and the family friend what Petitioner told her about the fire.

Petitioner's mother, Rebecca Duarte, told Detective Gray on July 6, 2009 that Petitioner arrived at her home around 7 a.m. on July 2, 2009, sweaty and "cracked out." Petitioner hugged

her and said "I killed somebody." At the trial she testified that she had only spoke with Petitioner briefly, "like a couple words." She testified that everything she heard about the fire was from her other two children, Petitioner's sister Ms. Palacios and Elias Robert.

The family friend, Lilliana Alvarez, also spoke with Detective Gray, and he determined that all of her information was from Petitioner's mother and sister and he had not spoken with Petitioner directly. At trial, Ms. Alvarez testified that she did not hear the information from Petitioner, but from his mother and sister.

After these interviews, Detective Gray changed his mind about the fire being an accident. The same day, Detective Gray contacted Dr. Gopal and told him that he had information regarding strangulation and probably blunt force trauma. Dr. Gopal was waiting for toxicology reports and was unable to provide the cause of death, but he said the information was consistent with head and throat wounds.

Later that day, Detective Gray instructed officers to question Petitioner and his brother Elias Robert. Petitioner identified himself as "Jay" but later admitted his name and explained that he gave a false name because he had traffic warrants. He was arrested. No one else was at the residence.

On July 7, 2009, Detective Gray gave more information to the fire investigator who had initially found the fire to be a smoldering-type fire and could have been started in a number of ways. The fire investigator testified at trial that his opinion was that the fire was started in a willful and malicious act with an open flame device. His opinion was consistent with someone placing a flammable item, such as toilet paper, on the mattress and lighting it on fire. He conceded on cross-examination that the fire could have started with a person smoking in bed, but it would not be common because a cigarette needed a lot of heat to ignite fabric.

Petitioner also testified at trial. He testified that he had been staying with Ms. Bustamonte, and on the morning of the fire, he and Ms. Bustamonte had been using rock cocaine with another man. Later a male client of Ms. Bustamonte arrived and Petitioner left the room. He testified that he stayed with a man named Casper and a woman named Marilyn for about three hours, walked to a store, and returned. Around daylight, Petitioner walked back to Ms. Bustamonte's room and saw

4

1    smoke coming from the door. He went to call 911, running into Mr. Brand on the way, and called
2    911 from the payphone. He went back to the room, where Mr. Brand was using a garden hose to
3    fight the fire. Petitioner took the hose and tried to help put out the fire. When the firefighters
4    arrived , they told everyone to leave. He did not stay because he did not want to get arrested for his
5    traffic warrants. Petitioner then walked to his mother's home, hugged her and cried, telling her
6    "there was a fire" and "that was my friend's room that caught on fire." He took a shower and slept.
7    When he woke, he and his sister, Ms. Palacios, took a walk and he did not tell her about the fire.
8    Petitioner walked back to the motel and saw Casper, who told him that Ms. Bustamonte had died
9    in the fire.

10   Detective Gray testified at trial that Petitioner's trial testimony was inconsistent with his
11   interview on July 6, 2009. Detective Gray testified that Petitioner said in his interview that he left
12   Ms. Bustamonte's room around 2 a.m. to go to a store, returned to her room and saw her asleep on
13   the bed, and went downstairs, where he was with Casper and a woman. Detective Gray also said
14   that petitioner had changed his story about whether or not he saw smoke, and had not mentioned
15   that he used a water hose. Detective Gray interviewed Casper and testified that Petitioner's
16   testimony regarding being with Casper that morning did not "pan out." Defense counsel's hearsay
17   objection was overruled.

18   A jury convicted Petitioner of second degree murder and arson of an inhabited structure.
19   He admitted one prior strike based on a juvenile adjudication. He was sentenced to fifteen years to
20   life for second degree murder with a consecutive determinate term of eight years for arson.
21   Because of the prior strike, his sentence was doubled to thirty years to life, and sixteen years,
22   respectively. Petitioner appealed his conviction in the California Court of Appeal, Fifth Appellate
23   District based on five grounds, the same of which are at issue in the instant petition. The Court of
24   Appeal affirmed the conviction.

25   Petitioner argues 1) that his right to effective assistance of counsel was violated by his
26   attorney's failure to object to or require a preliminary fact instruction regarding his mother and
27   sister's testimony based on the uncertainty of its origin, making it possible hearsay without an
28   exception; 2) that his right to effective assistance of counsel was violated by his attorney's failure

to request a modification of an allegedly confusing jury instruction regarding their consideration of oral statements made by Petitioner before trial; 3) that his right to confront witnesses was violated when the trial court allowed hearsay testimony from Detective Gray about his conversation with Casper; 4) that his right to due process was violated by the cumulative impact of the errors; and 5) that his right to due process was violated when the trial court used a prior juvenile adjudication as a strike.

## II.   STANDARD OF REVIEW

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

The AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102. "A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (*quoting Yarborough v.*

*Alvarado*, 541 U.S. 652, 664 (2004)). Put another way, a federal court may grant habeas relief only when the state court's application of Supreme Court precedent was objectively unreasonable and no fair-minded jurist could disagree that the state court's decision conflicted with Supreme Court's precedent. *Williams*, 529 U.S. at 411.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner argues that his constitutional right to effective assistance of counsel was violated in two ways. First, he argues that his trial counsel was ineffective for failing to raise objections to the expected trial testimony of his mother and sister, Ms. Duarte and Ms. Palacios, regarding the statements made on the morning of the fire. Petitioner argues that his trial counsel should have objected to their testimony because it was not clear whether their testimony regarding the details of the death and fire were heard directly from Petitioner, or indirectly from their brother Elias. If the jury found that their statements were from Elias Robert, their testimony would be inadmissible hearsay without an exception. Second, Petitioner argues that his trial counsel was ineffective for failing to object to a standard California jury instruction which instructs the jury to use caution when considering statements made by Petitioner tending to show his guilt unless the statement was written or otherwise recorded. He argued that the jury instruction was confusing, and the jury may have believed that his mother and sister's statements made to Detective Gray would not require cautious consideration because they were tape recorded.

A. <u>Applicable Law</u>

A habeas claim alleging appellate counsel was ineffective is evaluated under *Strickland v. Washington*, 466 U.S. 668, (1984). *See Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). To establish ineffective assistance of counsel, petitioner must prove: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-94, 697. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir.1998).

Habeas relief for ineffective assistance of counsel may only be granted if the state-court

decision unreasonably applied the *Strickland* standard. *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419 (2009).

    B. <u>Failure to Object to Petitioner's Mother and Sister's Expected Testimony</u>

  Petitioner argues that he was denied the Sixth Amendment right to effective assistance of counsel when his trial counsel failed to object to or seek a preliminary fact instruction to his mother and sister's hearsay testimony regarding statements he made to them regarding the murder and the fire. Petitioner argues that his mother and sister were not certain of the source of the statements –whether they heard Petitioner's admissions from him or from his brother Elias Robert- and his trial counsel was ineffective in allowing that testimony go to the jury without an objection or preliminary fact. Under California Law, if it was determined that Petitioner made the statements to his mother and sister, their testimony would be admissible as a hearsay exception. If it was determined that his mother and sister heard Petitioner's statements from Elias Robert, their testimony would be excluded as hearsay.

  The Court of Appeal extensively discussed this issue in its clear, well-reasoned opinion. The Court of Appeal explained that, at both the preliminary hearing and trial, Petitioner's sister stated that she spoke directly with Petitioner and Elias Robert, who told her what Petitioner told him about the murder and the fire. Petitioner's mother unequivocally stated that Petitioner told her he had killed someone, but stated that the rest of the information she had about the murder and the fire was from "the kids." The Court of Appeal reasoned that it would have been a valid tactical decision for defense counsel to raise hearsay objections to Petitioner's mother and sister's trial testimony based on their preliminary hearing testimony. However, the Court of Appeal found that Petitioner's trial counsel was not oblivious to the problems raised by their testimony, but the record demonstrated that defense counsel made a tactical decision to argue that Petitioner could not be convicted based on extrajudicial statements alone because there was no independent corroboration for those statements other than Dr. Gopal's opinion, which was also based on those statements. The Court of Appeal further found that an objection by defense counsel would have likely resulted in admission of the testimony subject to an instruction, which would not have resulted in a different outcome.

First, the Court of Appeal considered defense counsel's "formidable task" and the attempt to rely on a California rule which precludes a jury from convicting a defendant of murder based solely on the defendant's out-of-court statements without independent corroborating evidence. Petitioner's trial counsel argued to the jury that Dr. Gopal's opinion was influenced by Detective Gray's information regarding strangulation that he had obtained from Petitioner's mother and sister. Defense counsel was unsuccessful because Dr. Gopal insisted that he detected the strangulation and trauma injuries independently and prior to his conversation with Detective Gray. Dr. Gopal testified that he delayed in making initial findings because he was waiting for the toxicology report, not because he relied on any information provided by Detective Gray. The Court of Appeal could not find that counsel was ineffective given his apparent tactical decision.

Second, the Court of Appeal considered how the trial court would have ruled if faced with objections. If the court conducted a pretrial hearing to determine the admissibility of Petitioner's admission, the prosecution would have the burden to prove by a preponderance of the evidence that Petitioner, and not Elias Robert, made the statements directly to his mother and sister. The Court of Appeal found that, based on the preliminary hearing transcript, the trial court would have allowed the testimony to proceed before the jury. Petitioner's mother testified upon further examination at the preliminary hearing, that Petitioner directly told her that he killed someone. Petitioner's sister also testified that Petitioner, and not Elias Robert, told her about choking the victim and putting her in the bathtub. The trial court would have concluded that there was sufficient evidence to allow them to testify before the jury, and doubts as to their credibility would be for the jury's resolution.

Further, the Court of Appeal found that the jury received sufficient instructions regarding their consideration of Petitioner's inculpatory statements. The jury was given an instruction that it must decide whether Petitioner made any such statements in whole or in part, and to consider with caution any statement made by Petitioner tending to show his guilt. The jury also received an instruction that the prosecution must prove every item beyond a reasonable doubt. The Court of Appeal determined that the jury was properly instructed based on the entirety of the instructions. The jury was to determine beyond a reasonable doubt whether Petitioner made the statements

9

attributed to him by his mother and sister.

The Court of Appeal also considered another possible tactical reason to not move to exclude Petitioner's mother and sister's testimony. The trial court would not have excluded their testimony in its entirety but would have been able allowed them to testify about what statements Petitioner directly said to them, including his statement to his mother that he killed someone. If part of their testimony was excluded, defense counsel would not have been able to impeach them with inconsistencies between their statements made to Detective Gray a few days after the fire, their preliminary hearing testimony, and their trial testimony. Instead, defense counsel allowed the testimony to come in, and extensively impeached Petitioner's mother and sister with their prior inconsistent statements and on the question of whether they directly spoke with Petitioner, and argued that they were confused about what they knew. The Court of Appeal found that Petitioner's trial counsel used cross-examination to demonstrate that his mother and sister were less than credible and confused as to the precise nature of the alleged extrajudicial statements.

Lastly, the Court of Appeal found that, even if defense counsel was ineffective for failing to attempt to exclude the testimony and the trial court granted pretrial hearsay objections, Petitioner has not shown prejudice flowing from counsel's performance. The Court of Appeal summarized that Dr. Gopal testified that Ms. Bustamonte died from strangulation and cocaine intoxication, and not smoke inhalation, based on his independent discoveries from the autopsy. Ms. Bustamonte's blood was found on the shower curtain –a fact not critical, but relevant because Dr. Gopal found blunt force trauma to the head, Petitioner admitted that he had been in the room with her in the hours before the fire, and he was seen by another guest, Mr. Brand, walking away from Ms. Bustamonte's room as smoke emerged from under the door. The motel manager testified that Petitioner spoke with her during the fire and said that he believed Ms. Bustamonte was still in the room and said to her, "That's what karma will get you." The motel manager testified that Petitioner left the scene. Petitioner testified that he claimed he went back up to the room to fight the fire with a garden hose, but he did not tell this to Detective Gray in his initial interview, and Mr. Brand testified that Petitioner did not return upstairs. Petitioner's mother specifically testified without contradiction that Petitioner arrived at her home early that morning and said, "I killed

someone." Petitioner's sister testified that Petitioner made certain inculpatory statements about the murder and arson directly to her. Statements made by Petitioner directly to his mother and sister would not have been subject to exclusion as hearsay. Petitioner also gave a false name when police arrived at the residence and arrested him. He claimed he was trying to avoid arrest for traffic citations. The Court of Appeal concluded based on the entirety of the record that trial counsel's failure to raise hearsay objections to Petitioner's mother and sister's trial testimony was not prejudicial because it was not reasonably probable that the result would have been more favorable to Petitioner.

The Court of Appeal thoroughly reviewed each of Petitioner's arguments and appropriately concluded that Petitioner's trial counsel performance was not defective, and, even it was, there was no reasonable likelihood of prejudice based on that performance. The Court of Appeal discussed trial counsel's reasonable tactical decisions –that counsel was well aware of the problems with Petitioner's mother and sister's testimony but, rather than objecting to the testimony and attempting to exclude part of it, instead chose to extensively cross-examine and impeach the witnesses to undermine their credibility and argue that the jury could not convict Petitioner based on his extrajudicial statements without corroborating evidence. This tactical decision did not fall below an objective standard of reasonableness under prevailing professional norms. The Court of Appeal correctly opined that some or all of the disputed testimony would have been permitted to go before the jury and it would be the jury's province to assess its credibility. Counsel made a tactical decision to attempt to weaken the testimony by cross-examination and argument. Also, the Court of Appeals discussed the jury instructions and reasonably found that the jury was properly instructed to consider whether Petitioner made those statements to his mother and sister, and to make that finding beyond a reasonable doubt.

The Court of Appeal also reasonably found that any defective performance did not result in prejudice. The Court of Appeal summarized the prosecution's evidence, and appropriately found that there was no reasonable likelihood of a different outcome if the portions of Petitioner's mother and sister's testimony with an uncertain source were excluded. The autopsy demonstrated that the victim had been strangled to death. Petitioner admitted that he was in the victim's room in

the hours before the fire, and was seen walking away from her room while smoke arose from under the door. Petitioner's mother testified that he told her he killed someone. Petitioner's sister testified that he told her some of the details of the murder, including that he said Ms. Bustamonte was a snitch, he strangled her and put her in the bathtub. The Court of Appeal reasonably found that it was not reasonably likely that the exclusion of Petitioner's mother and sister's other statements regarding the specific facts of the murder and fire would have resulted in a different outcome for Petitioner.

The Court of Appeal properly found that counsel's failure to object to the testimony was a reasonable tactical decision and did not fall below an objective standard of reasonableness under prevailing professional norms.  The Court of Appeal also properly found that, even if trial counsel's performance had been defective, there was not a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different. Hence, the Court of Appeal's finding that Petitioner's trial counsel was not prejudicially ineffective was not contrary to, and did not involve unreasonable application of, clearly established federal law.

### C. Failure to Seek Clarification of Jury Instruction

The trial court instructed the jury with California Judicial Council criminal jury instructions ("CALCRIM"), including CALCRIM 358, regarding the jury's consideration of whether or not a defendant made oral or written statements, of which evidence was heard. Petitioner argues that the use of CALCRIM 358 should have been modified by the trial court, or requested by his attorney to be modified.  CALCRIM 358 instructs that the court has a sua sponte duty to give the instruction when there is evidence of an out-of-court oral statement made by the defendant. The instruction has an additional paragraph which states: [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]. The court has a sua sponte duty to give this additional paragraph when there is evidence of an incriminating out-of-court oral statement made by the defendant. The additional paragraph is not required when the jury only heard exculpatory statements.

"A court must formulate jury instructions so that they fairly and sufficiently address the issues a case presents, accurately state the law, and are not misleading." *Mena v. City of Simi*

*Valley*, 332 F.3d 1255, 1267 (9th Cir. 2003). The trial court must "give instructions which are meaningful, not in terms of some abstract case, but which can be understood and given effect by the jury once it resolves the issues of fact which are in dispute." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004). Form instructions are not necessarily self-explanatory. *See Ricci v. AB Volvo*, 106 Fed. Appx. 573, 576 (9th Cir. 2004).

Petitioner argued that the instruction may have misled the jury into believing that it did not have to consider with caution the statements attributed to Petitioner by his mother and sister, because his mother and sister's statements to Detective Gray were recorded. The Court of Appeal found that Petitioner had not made the requisite showing that there was a reasonable likelihood that the jury understood the instruction in the way asserted by Petitioner and caused the jury to misapply the law. The plain language of the instruction directs that the jury to use caution when considering incriminating statements made by Petitioner to his mother and sister, unless Petitioner's statement was recorded. Petitioner's statements to his mother and sister were not recorded. His mother and sister testified as to what Petitioner's statements to them were. They also had told Detective Gray during their recorded interviews what incriminating statements Petitioner had made. It is not reasonably likely that the jury would understand that Petitioner's statement was recorded based on the fact that his mother and sister's interviews regarding his incriminating statements were recorded. Neither is it reasonably likely that the jury would understand that the jury instruction to mean that they would not need to use caution when considering Petitioner's unrecorded incriminating statements made to his mother and sister. Clarification of the instruction's plain language by the trial court was not required.

Hence, the Court of Appeal's decision that the trial court did not have a duty to modify the instruction and that defense counsel did not fall below the standard for failing to request a clarification is not contrary to, and did not involve unreasonable application of, clearly established federal law.

IV.   CONFRONTATION CLAUSE

Petitioner argues that his right to confront and examine witnesses under the Sixth Amendment was violated when the trial court allowed hearsay testimony regarding Petitioner's

13

alibi. The trial court allowed Detective Gray to testify as to what Casper, the man with whom Petitioner claimed to be during the morning of the fire, said to him. Detective Gray testified that he spoke with Casper, and Petitioner's alibi testimony that he was with Casper and his friend did not "pan out." The Court of Appeal reasoned that any possible error was harmless because neither Casper nor his friend were called to testify, and Petitioner's trial testimony was "riddled with inconsistencies" regarding his actions that morning. These inconsistencies conclusively undermined Petitioner's alibi.

The Sixth Amendment's Confrontation clause bars the government from introducing testimonial statements of witnesses absent from trial unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. U.S. Const., Amend. VI; *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Constitutional error does not warrant automatic reversal if it is deemed harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993). In determining whether a constitutional error was harmless on habeas review, we examine "the record as a whole" and ask whether the violation had a "substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 637-38 (*quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In applying the *Brecht* test, the court may consider, among other things, the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case. *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011).

The Court of Appeal pointed out that Petitioner testified that he had called 911, rushed back upstairs, and helped fight the fire with a garden hose. He did not mention that he had gone back to the room and helped fight the fire with a hose or otherwise to Detective Gray at his pretrial interview. Andrew Brand testified that he saw Petitioner walking away from Ms. Bustamonte's room and Petitioner asked him if he had a cell phone. Mr. Brand testified that he saw Petitioner on the payphone, and did not see him again. Mr. Brand testified that he and the hotel manager's husband kicked down the door and tried to use fire extinguishers to fight the fire. He did not testify that he used a fire hose or that anyone else helped fight the fire before the fire department arrived. The motel manager testified that Petitioner was next to her as the firefighters arrived. The

Court of Appeal found that these inconsistencies conclusively undermined his trial testimony, making the admission of Detective Gray's testimony about Casper harmless.

Detective Gray was permitted to testify as to an out of court statement offered to prove that Petitioner was not where he said he was before the fire. The Court of Appeal points to various points in Petitioner's testimony, primarily as to what occurred after the discovery of the fire, that were contradicted by his prior statement or by other testimony. This argument casts doubt on Petitioner's testimony as to the facts occurring after the fire and as to his testimony as a whole. In addition, the exclusion of Detective Gray's testimony at issue would not make a significant impact on the jury's verdict. Other than his own testimony that he was with Casper and his friend before the fire, Petitioner presented no evidence or witnesses corroborating that testimony. Defense counsel did not call Casper, his friend, or any person Petitioner had identified as being in Ms. Bustamonte's room earlier that morning. The evidence also demonstrated that he was staying with Ms. Bustamonte for a period of time before the fire, he was seen walking away from Ms. Bustamonte's room the morning of the fire, and he told his mother and sister that he had killed someone with some significant detail. Considering the *Brecht* factors and the evidence presented at trial, the Court of Appeal's decision that the erroneously admitted hearsay statements did not have a substantial and injurious effect or influence in determining the jury's verdict was not contrary to, and did not involve unreasonable application of, clearly established federal law.

V.     CUMMULATIVE IMPACT

Petitioner argues that the cumulative impact of the errors denied him due process of law and a fair trial under the Fifth, Sixth, and Fourteenth Amendments. The Court of Appeal reasoned that, give their determinations as to the first three issues, they also would reject Petitioner's argument that cumulative error occurred at his trial.

As this Court finds that the Court of Appeal's rulings on the first three issues were not contrary to clearly established federal law, it follows that the Court of Appeal's rejection of Petitioner's cumulative error argument is not contrary to clearly established federal law.

VI.    USE OF JUVENILE ADJUDICATION AS STRIKE

Petitioner argues that the use of a prior juvenile adjudication as a strike violated his rights

to due process, notice, and jury trial under the Fifth, Sixth, and Fourteenth Amendments. The Court of Appeal reasoned that the trial court's use of Petitioner's juvenile adjudication for assault with a deadly weapon as a strike was proper under binding California law.

California permits juvenile adjudication to qualify as a strike. *People v. Nguyen*, 46 Cal. 4th 1007, 1028 (2009), *cert. denied, Nguyen v. California*, 559 U.S. 1067 (2010). In 2010, nineteen states explicitly prohibit the use of juvenile adjudication as a strike. *See United States v. Orona*, 724 F.3d 1297, 1301 (10th Cir. 2013)(*citing* Joseph I. Goldstein-Breyer, Note, *Calling Strikes before He Stepped to the Plate: Why Juvenile Adjudications Should Not Be Used To Enhance Adult Sentences*, 15 Berkeley J. Crim. L. 65, 88 (2010)). The states have not reached a meaningful consensus regarding the manner in which juvenile adjudications may be considered in adult sentencing proceedings. *Id*. at 1301-02. Petitioner argues that this issue should be addressed by the U.S. Supreme Court.

The Eighth Amendment "permits courts to use prior juvenile convictions to increase the sentence of an adult convicted of a crime." *United States v. Edwards*, 734 F.3d 850, 851 (9th Cir. 2013). "[T]he Fifth Circuit has said, 'at the federal level, sentences are routinely enhanced under the sentencing guidelines based upon juvenile convictions.'" *Id*. at 853 (*quoting United States v. Mays*, 466 F.3d 335, 340 (5th Cir. 2006). In addition, the U.S. Supreme Court denied review of California's use of juvenile adjudication as a strike. 559 U.S. 1067 (2010).

Further, regarding Petitioner's rights to due process, notice and a jury trial, "sentence-enhancing prior convictions do not require charging notice and proof beyond reasonable doubt to a jury. *Jones v. United States*, 526 U.S. 227, 248 (1999). Any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt, *except* the fact of a prior conviction itself. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

Here, it is not disputed that Petitioner sustained a prior conviction for assault with a deadly weapon as a juvenile. Petitioner's right to due process and a jury trial were not implicated by the trial court's sentencing decision without submitting the issue to the jury. Hence, the trial court's use of a prior juvenile adjudication as a strike was not contrary to, and did not involve an

unreasonable application of, clearly established federal law.

## VII. APPEALABILITY

For the reasons set forth above, Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Hence, the Court should decline to issue a certificate of appealability.

## VIII. RECOMMENDATION

Based on the foregoing, it is RECOMMENDED that:

1. The petition for writ of habeas corpus be DENIED;
2. Judgment be ENTERED for Respondent; and
3. The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, Petitioner may file written objections with the Court, serving a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: __October 21, 2015__          **/s/ Sandra M. Snyder**
                                    UNITED STATES MAGISTRATE JUDGE